CLERK'S OFFICE U.S. DIST. COURT
AT BIG STONE GAP, VA
FILED

JUL 1 3 2006

JOHN F CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

MICHAEL P. LESTER,  )
    Plaintiff,  )
            )    Civil Action No. 1:05cv00088
v.  )
            )    **MEMORANDUM OPINION**
JO ANNE B. BARNHART,  )
**Commissioner of Social Security,**  )    BY:  GLEN M. WILLIAMS
    Defendant.  )    Senior United States District Judge
            )
            )

In this social security case, the court affirms the final decision of the Commissioner denying benefits.

## I. Background and Standard of Review

The plaintiff, Michael P. Lester, ("Lester"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying the plaintiff's claims for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 (West 2003 & Supp. 2005). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

Case 1:05-cv-00088-GMW-PMS   Document 15   Filed 07/13/06   Page 1 of 36   Pageid#: 90

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence, but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

Lester protectively filed his current application for DIB on or about October 17, 2002, alleging disability as of August 5, 2002, due to low back pain and numbness in his legs. (Record, ("R."), at 89-92, 103.) His claims were denied initially and on reconsideration. (R. at 37-43, 48-52.) Lester then requested a hearing before an administrative law judge, ("ALJ"). (R. at 53.) The ALJ held a hearing on February 25, 2004, during which Lester was represented by counsel. (R. at 374-425.) A subsequent hearing was held on July 28, 2004, during which Lester also was represented by counsel. (R. at 426-81.)

By decision dated February 16, 2005, the ALJ denied Lester's claims. (R. at 15-32.) The ALJ found that Lester was insured for DIB purposes through February 16, 2005.[1] (R. at 31.) Furthermore, the ALJ found that Lester had not engaged in substantial gainful activity since August 5, 2002. (R. at 31.) The ALJ found that Lester suffered from a back disorder and depression/anxiety disorder, which are

---

[1]Thus, for purposes of Lester's DIB claim, he must show the existence of a disability on or prior to February 16, 2005.

Case 1:05-cv-00088-GMW-PMS   Document 15   Filed 07/13/06   Page 2 of 36   Pageid#: 91

severe impairments, but that Lester did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.) The ALJ also found that Lester's allegations regarding his limitations were not totally credible. (R. at 31.) The ALJ found that Lester had the residual functional capacity to perform a significant range of light[2] work, but that Lester was unable to perform his past relevant work. (R. at 31.) Based on Lester's age, education, past work and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy that Lester could perform, such as watch guard, parking lot attendant[3], hand packer, laundry worker and vehicle/equipment cleaner. (R. at 31.) Thus, the ALJ found that Lester was not under a disability as defined by the Act at any time through the date of the decision and was not eligible for benefits. (R. at 31.) *See* 20 C.F.R. § 404.1520(g) (2006).

After the ALJ issued her opinion, Lester pursued his administrative appeals, (R. at 9-10), but the Appeals Council denied his request for review. (R. at 6-8.) Lester then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2005). The case is before this court on Lester's Motion For Summary Judgment filed February 14, 2006, (Docket Item No. 10), and the Commissioner's Motion For Summary Judgment, filed April 13, 2006. (Docket Item No. 13).

---

[2]The regulations define light work as work that involves lifting objects weighing up to 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. If someone can do light work, he also can do sedentary work. *See* 20 C.F.R. § 404.1567(b) (2005).

[3]The ALJ's opinion lists "park attendant," but the vocational expert testified that Lester could perform a "parking lot attendant" job. (R. at 469-70.)

## II. Facts

Lester was born in 1977, (R. at 330-31), which classifies him as a younger person under 20 C.F.R. § 404.1563(c). Lester completed high school, and he has past relevant work experience as a machine operator, a boiler tender, a belt man, a delivery person and a press operator. (R. at 465.)

At his first hearing, Lester testified that he initially injured his back while attempting to lift a heaving item at work. (R. at 405-06.) X-rays showed that Lester had suffered a bugling disc at the L4-L5 level. (R. at 406.) Six months after his injury, Lester returned to work as a coal miner until he suffered another back injury to the L4-L5 level on August 5, 2002, from lifting a item at work. (R. at 389, 405-08.) Approximately two months after this incident, Lester attempted to return to work, but was unable to work due to his back pain. (R. at 409.) Lester attempted numerous times to return to work, but was always unable to work for longer than a week or a week and one-half due to his back pain. (R. at 390, 405-06, 409.) Lester stated that his doctor had told him that he was not a candidate for surgery, and, instead, had prescribed pain medication and ordered physical therapy. (R. at 408.) Lester indicated that he had completed physical therapy three times a week for four weeks, but that against the suggestion of his physical therapist, he had not returned for further physical therapy. (R. at 408.)

Lester testified that he continued to suffer from back pain, for which nothing eased his pain. (R. at 391.) Lester stated that he could not sleep, drive an automobile, ride in an automobile for long periods of time, lift items or shower without assistance

-4-

due to his back pain. (R. at 391.) Lester also testified that he suffered from back spasms. (R. at 391.) Lester stated that both his back pain and back spasms were exacerbated by routine activities, such as picking up clothes from the floor. (R. at 392.) Lester indicated that he would lie down, alternate using heat and ice on his back and have his wife massage his back with Bio-Freeze. (R. at 392.) Lester stated that he took Lortab and Soma for his back pain and Zoloft for his nerves. (R. at 393-96.) Lester testified that he had never suffered from problems with his nerves until he injured his back. (R. at 396.) Lester also stated that his back pain occasionally caused numbness in his right leg that made him susceptible to falls. (R. at 396.) When he suffered from such leg numbness, Lester indicated that he would lie down and massage Bio-Freeze on the leg. (R. at 397.)

In describing his daily activities, Lester testified that he spent three to four hours lying down on a good day and 12 hours on a bad day. (R. at 398.) Lester testified that sitting was uncomfortable, but that stretching out his legs helped ease the discomfort. (R. at 398.) Lester stated that he never went into the supermarket for fear that he would fall. (R. at 398-99.) Lester also claimed that he was unable to partake in many activities with his young son; in fact, Lester stated that reading, drawing, doing crafts, taking short walks and tossing a ball with his son was the extent of what he could do. (R. at 400, 405.) Lester testified that he occasionally visited his mother who lived a very short distance from his home, but denied visiting anyone else. (R. at 401.) However, Lester stated that he did accompany his son to his mother's house every day and stayed for approximately four hours a day. (R. at 414.) Lester further denied engaging in any hobbies, attending family reunions or church services or corresponding with his brother. (R. at 401-02.) When asked what

-5-

he did on his good days, Lester testified that he watched television. (R. at 403.) The ALJ also inquired into Lester's alcohol, tobacco and marijuana use. (R. at 416-18.) Lester denied drinking any alcohol over the past three years and further denied any marijuana use over the past four and one-half years. (R. at 417-18.) Lester also denied trying any other illegal drug. (R. 418-19.) Lester stated that he smoked approximately one-half pack of cigarettes a day. (R. at 419.)

At Lester's second hearing before an ALJ, Lester testified that he had visited a pain management specialist once since his prior hearing and had been placed on new pain medications. (R. at 439-40.) Lester stated that these pain medications had caused chest pains, difficulty breathing and dizziness, so upon advice from his pain specialist, he discontinued his use of prescription pain medicine, and, instead, took Motrin and Tylenol for his pain. (R. at 444-45.) Lester indicated that he was awaiting an appointment with his pain management specialist to address his pain management. (R. at 445.) Lester further testified that he continued to take medication for his nervousness. (R. at 446.) Lester stated that he did not believe that his condition was improving, but that he did not attend physical therapy because it had not been recommended from the worker's compensation program. (R. at 447-48.)

When asked by the ALJ why he believed he could no longer work even at the light level of exertion, Lester testified that it was because of pain in his back. (R. at 449-50.) Lester explained that he spent most of his time lying down and using a heating pad. (R. at 454.) Lester also stated the he continued to use Bio-Freeze on his back to help relieve the pain. (R. at 459.) Lester stated that he did not leave the house to socialize. (R. at 459-60.)

-6-

James Williams, a vocational expert, also testified at Lester's hearing. (R. at 464-79.) Williams described Lester's position as a machine operator as "medium[4] and semiskilled," the position as a boiler attendant as "medium and semiskilled" and the position as a belt man as "light and unskilled," although he believed that the work Lester performed as a belt man was in the medium to heavy[5] range. (R. at 466-67.) Williams further classified Lester's work as a delivery person as "medium and unskilled" and the position as a press operator as "heavy and unskilled." (R. at 467.) Williams confirmed that Lester would not be able to return to his past relevant work if he were capable of performing only light or sedentary work. (R. at 467.)

Williams was then asked to consider a hypothetical individual of Lester's age, education and past relevant work experience who had the residual functional capacity to perform light work and required a sit/stand option throughout the day. (R. at 467.) Williams was further asked to assume that the individual would have a moderate reduction in concentration and would be limited to very simple noncomplex tasks. (R. at 447.) The ALJ also asked Williams to assume that the individual could not lift items weighing more than 20 pounds, could not push or pull items weighing more than 20 pounds, could only occasionally bend, stoop or squat and would need a chair with back support. (R. at 468.) Williams was further asked to assume that the individual would need to change positions between sitting, standing and walking, but

---

[4]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If someone can perform medium work, he also can perform light and sedentary work. *See* 20 C.F.R. § 404.1567(c) (2006).

[5]Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting or carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. § 404.1567(d) (2006).

-7-

was unrestricted with repetitive foot movements, fine manipulation, firm grasping, simple grasping and balancing. (R. at 468.) Williams testified that, given these restrictions, such an individual could perform the full range of light work. (R. at 469.)

The ALJ asked Williams to further assume that the individual had poor reading and writing skills despite a high school education, and, therefore, would be unable to perform frequent reading, writing and mathematics. (R. at 469.) Williams stated that there were jobs available for such an individual, such as a watch guard, a parking lot attendant, a hand packer, a laundry worker and a vehicle and equipment cleaning attendant. (R. at 469-70.) Williams identified 294,000 watch guard jobs available in the national economy and 17,640 in the mid-Atlantic economy, 50,960 parking lot attendant jobs available in the national economy and 2,254 in the mid-Atlantic economy, 198,940 hand packer jobs available in the national economy and 1,740 in the mid-Atlantic economy, 91,140 laundry worker jobs available in the national economy and 5,488 available in the mid-Atlantic economy and 57,820 vehicle and equipment cleaning attendant jobs available in the national economy and 13,234 in the mid-Atlantic economy. (R. at 469-70.) Williams identified that each of these positions was classified as light work. (R. at 470.) Williams further stated that if the hypothetical individual also had a poor or no useful ability to deal with the public and to deal with work stresses, then he would probably still be able to perform the same jobs, although he might have some difficulty in his performance, except for that of parking lot attendant. (R. at 476.) However, Williams testified that if instead the hypothetical individual had a poor ability to function in all work-related activities, then he would be precluded from all work. (R. at 478-79.)

-8-

In rendering her decision, the ALJ reviewed records from Thompson Family Health Center; Buchanan General Hospital; Merritt Physical Therapy and Rehabilitation, Inc., P.C.; Dr. Morgan Lorio, M.D.; The Counseling Center; H.J. Patel, M.D.; Dr. John Marshall, M.D.; Dr. Richard Salamone, M.D.; Dr. Frank M. Johnson, M.D., a state agency physician; Eugenie Hamilton, Ph.D., a state agency psychologist; Arthur C. Ballas, Ph.D.; Bristol Regional Medical Center; Stone Mountain Health Services; Crystal Burke; and Dr. Dennis M. Aguirre, M.D. Lester's counsel also submitted additional medical records from Mark S. Mehferber, PA-C; Stone Mountain Health Services, Merritt Physical Therapy and Rehabilitation, Inc., P.C. and B. Wayne Lanthorn, Ph.D.[6]

After Lester injured his back at work on August 5, 2002, he visited Buchanan General Hospital. (R. at 176-78.) Lester described a severe sharp pain in his lower back that was exacerbated by positioning, walking and exercise and could be relieved by nothing. (R. at 177.) Lester was assessed with a muscle strain/spasm, prescribed Lortab and released from the hospital. (R. at 176, 178.) On August 8, 2002, Lester had x-rays taken of his lumbar spine and cervical spine. (R. at 169, 171-72.) X-rays of his cervical spine showed no demonstrable fracture or subluxation, while the disc spaces, prevertebral soft tissues and facet joints were unremarkable. (R. at 172.) Images of Lester's lumbar spine showed no identifiable bony or disc space pathology. (R. at 171.) Lester was assessed with cervicalgia and prescribed Lortab and Soma. (R. at 169.) An MRI of Lester's lumbar spine taken on August 15, 2002, revealed

---

[6]Since the Appeals Council considered this evidence in reaching its decision not to grant review, (R. at 5-7), this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

resolution of the small disc protrusion at the L4-L5 level with a persistent bulging disc noted, but otherwise the study was unremarkable. (R. at 164.) An MRI of Lester's cervical spine taken that same date showed straightening of Lester's cervical lordosis, which could have been due to an underlying spasm; however, there was no disc herniation, bulge or any other abnormality detected. (R. at 166.) On August 19, 2002, Lester was assessed with a bulging disc at the L4-L5 level and a C-spine spasm, for which he was prescribed Lortab and ordered to continue his use of Soma. (R. at 161.)

On August 30, 2002, Lester saw Mark S. Mehlferber, PA-C, for treatment of his lower back pain with left low extremity radiculopathy. (R. at 209.) After reviewing the x-rays and MRIs from Buchanan General Hospital and examining Lester, Mehlferber diagnosed Lester with low back pain with left lower extremity radiculopathy, minimal degenerative disc changes at the L4-5 and L5-S1 levels and minimal disc bulge at the L4-L5 and L5-S1 levels. (R. at 209.) Mehlferber recommended Lester undergo a lumbar epidural injection and begin physical therapy. (R. at 209.) Mehlferber also gave Lester Ultram, Zanaflex and Naprosyn. (R. at 209.) Mehlferber found that Lester was capable of returning to light duty, but should not lift items weighing more than 20 pounds and should change positions as needed. (R. at 209.)

Lester began physical therapy at Merritt Physical Therapy and Rehabilitation, Inc., P.C., on September 6, 2002. (R. at 186-89.) After six sessions of physical therapy, Lester reported no change in his symptoms. (R. at 184.) Lester's physical therapist instructed him to continue a home exercise program that consisted of lumbar

stretches. (R. at 184.) The records indicated that Lester's last physical therapy session was on October 28, 2002. (R. at 161.)

Lester returned to Buchanan General Hospital on September 13, 2002, with continued complaints of back pain and leg pain. (R. at 173-75.) The attending physician assessed Lester with acute exacerbation of lumbar back pain, but found that Lester was capable of returning to light duty. (R. at 173, 175.) Lester returned on September 16, 2002, with complaints of continued back pain and difficulty sleeping. (R. at 160.) An examination revealed that Lester's lumbar spine tolerated palpation, but that he was experiencing back spasms. (R. at 160.) Lester was given injections of Nubain and Phenergan in his right hip and prescribed Lortab, Flexeril and Soma. (R. at 160.) On September 25, 2002, Lester complained of back pain with right leg radiating distress. (R. at 156-59.) Upon a physical examination, Dr. Morgan Lorio, M.D., found that Lester had a blunt affect and had a suggestion of a positive straight leg raise maneuver at extremes. (R. at 156.) Furthermore, Dr. Lorio determined that Lester was neurologically intact, but had subjective numbness at the L5-S1 level dermatome. (R. at 156.) Lester reported to Dr. Lorio that he could not continue with light duty, but was resistant to Dr. Lorio's recommendation to receive an epidural. (R. at 156.) Dr. Lorio assessed Lester with right leg lumbar radiculopathy with associated back pain and suggested that Lester remain out of work until he received an epidural. (R. at 156.) Dr. Lorio indicated that Lester could continue with physical therapy and could work if he would proceed with an epidural. (R. at 156.) Dr. Lorio evaluated Lester again on October 25, 2002, and found that Lester should not work until he received an epidural. (R. at 202-03.) Lester received an epidural steroid injection at the right L4-L5 level from Bristol Regional Medical Center, ("BRMC"),

-11-

on October 29, 2002. (R. at 204-05.) The next day, Lester reported to a physician assistant at Buchanan General Hospital that the shooting pains in his right leg had subsided. (R. at 291.) Lester also reported that his medications had helped his anxiety and depression. (R. at 291.) Lester was given an injection of Toradol. (R. at 291.)

Lester saw Mehlferber again on November 1, 2002, and related that the epidural steroid injection provided minimal relief of his symptoms. (R. at 200-01.) Lester continued to have positive straight leg raise on his right side and sciatic notch tenderness on his right side. (R. at 200.) Lester was given Lortab, Zanaflex and Naprosyn and was scheduled for a CT myelogram of his lumbar spine and EMG studies of his right lower extremity. (R. at 200.) Mehlferber advised that Lester should remain out of work. (R. at 200.)

On November 12, 2002, Lester underwent a CT myelogram at BRMC. (R. at 192-99.) A CT scan of Lester's lumbar spine showed minimal concentric protrusions at multiple levels, although no eccentricity or extrusion was seen and the canal and foramina were patent throughout. (R. at 192-93.) A lumbar myelogram was consistent with minimal disc protrusions at the L2-3, L3-4 and L4-5 levels, but no disc extrusion was seen. (R. at 194-95.)

Lester saw Dr. Lorio on November 15, 2002, with continued complaints of low back pain with leg weakness. (R. at 190-91.) Dr. Lorio summarized the results of nerve conduction EMG testing done at Mountain Empire Neurologic Associates, P.C., that specifically focused on Lester's right leg, but found no objective findings

-12-

of neural injury. (R. at 190.) Dr. Lorio referred Lester to Dr. Jim Brasfield, M.D., for a neurosurgical consultation. (R. at 190-91.)

On January 10, 2003, Lester saw Mehlferber for a follow-up. (R. at 301.) Mehlferber found Lester's condition unchanged except for increased depression and anxiety. (R. at 301.) Mehlferber discussed with Lester his continuation of light duty work, but recommended that Lester use a chair with back support and change positions as needed. (R. at 301.)

Lester began counseling at The Counseling Center on January 15, 2003. (R. at 221-28.) Lester related that he had suffered from depression since childhood, but that it had worsened since his back injury prevented him from returning to work. (R. at 223.) Lester presented with a flat affect, a depressed mood and made no eye contact with the counselor. (R. at 223.) Lester was assessed with a severe major depressive disorder without psychotic features and was scheduled to attend individual counseling once a week. (R. at 222.)

Merritt Physical Therapy and Rehabilitation performed a functional capacity evaluation on Lester on January 20, 2003. (R. at 346-61.) Lester's tests indicated that his pain profile was in the high category, and his validity profile scored valid, although his symptom response behaviors did not correlate well with his objective data and available medical history. (R. at 346.) Lester's test activity limitations were due to reported pain increase or fear of pain increase and not actually observed maximum effort. (R. at 346.) It was determined that Lester could sit constantly, frequently stand, walk, push and pull items weighing up to 20 pounds, lift items

-13-

weighing up to 10 pounds from overhead or waist, carry items weighing up to 10 pounds and reach and occasionally push and pull items weighing up to 20 pounds, kneel, crawl, crouch, lift items weighing up to 15 pounds from overhead or waist, carry items weighing up to 15 pounds, climb stairs and twist at the waist (R. at 346.) Lester had no restrictions on his ability to do repetitive foot controls, fine manipulation, firm grasping or simple grasping. (R. at 346.)

On January 24, 2003, Lester visited H.J. Patel, M.D., for treatment of depression. (R. at 231-32.) Lester indicated that he had been prescribed Elavil and Effexor, but that he could not afford to continue taking them. (R. at 231.) Dr. Patel found Lester alert and oriented, although he also seemed to be somewhat withdrawn and depressed. (R. at 231.) Dr. Patel diagnosed Lester with depression associated with anxiety and insomnia related to back pain. (R. at 231.) Dr. Patel gave Lester Paxil and Aluna and advised that Lester could need inpatient psychiatric treatment if the medications did not improve his condition. (R. at 232.) The records indicated that Lester saw Dr. Patel again on January 28, 2003, and February 4, 2003, but no change in his symptoms was noted. (R. at 229-30.)

On January 29, 2003, Lester underwent a psychological evaluation from Dr. Richard Salamone, Ph.D, a neuropsychologist. (R. at 239-40.) Lester complained of a diminished appetite, poor sleep secondary to rumination, diminished energy, irritability, diminished libido, diminished general interest in things and some memory and concentration problems. (R. at 241.) A Minnesota Mutiphasic Personality Inventory-2, ("MMPI-2"), was given to Lester, which was invalid but strongly indicative of exaggerated responding/symptom endorsement. (R. at 242.) Salamone

noted that an exaggerated MMPI-2 profile boded poorly with regard to likely successful return to work and resolution of subjective complaints of pain. (R. at 242.) Lester was assessed with a pain disorder associated with both psychological factors and a general medical condition, but Salamone was able to rule out an adjustment disorder. (R. at 242.) Lester also visited Dr. John Marshall, M.D., for a physiatric evaluation on January 29, 2003. (R. at 330-32.) Dr. Marshall noted that Lester had a flat affect and walked very slowly and continued Lester's use of Lortab and Soma. (R. at 331.)

Lester visited Salamone for follow-ups on February 5, 2003, and February 21, 2003. (R. at 236-38.) At both appointments, Salamone found Lester's condition virtually the same as observed in his initial appointment. (R. at 237, 239.) Salamone advised Lester that he needed to increase his activity level gradually, within his limits, since the record indicated that Lester did nothing and rarely left his house. (R. at 236, 238.) Salamone also suggested that Lester attempt some relaxation type procedures to better cope with chronic pain and mood disturbance; however, Lester did not actively participate in Salamone's attempts to have Lester try these procedures in the office. (R. at 236, 238.) On March 19, 2003, Salamone noted that he had some significant concerns about Lester's long-term outcome, since Lester seemed to have difficulty taking responsibility for improving his activity level and did not seem motivated to do such. (R. at 235.)

On February 21, 2003, Mehlferber indicated that Lester was to return to work with permanent sedentary light duty work restrictions of no lifting and/or pushing/pulling items weighing more than 20 pounds and that Lester should avoid

prolonged bending, stooping and squatting activities. (R. at 299.) Mehlferber also found that Lester should use a chair with back support and should change positions between sitting, standing and walking, but was otherwise unrestricted. (R. at 299.)

Lester had a neurosurgical consultation with Dr. Brasfield on April 1, 2003. (R. at 313-15.) Dr. Brasfield determined that Lester did not have a surgical problem, but that work hardening would allow him to return to his regular work without restrictions. (R. at 314.) Dr. Brasfield did not prescribe any medications. (R. at 314.)

On April 21, 2003, Dr. Frank M. Johnson, M.D., a state agency physician, completed a Residual Physical Functional Capacity Assessment for Lester. (R. at 243-50.) Dr. Johnson concluded that Lester could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, stand and/or walk about six hours in an eight-hour workday and sit with normal breaks for about six hours in an eight-hour workday. (R. at 244.) Dr. Johnson also found that Lester's ability to push and/or pull was limited in his lower extremities, namely his back. (R. at 244.) Dr. Johnson also found that Lester could frequently climb ramps/stairs and balance, could only occasionally stoop, kneel, crouch or crawl and could never climb ladders/ropes/scaffolds. (R. at 246.) Dr. Johnson found that Lester had no manipulative limitations, visual limitations, communicative limitations or environmental limitations. (R. at 246-48.) Dr. Johnson found Lester's allegations partially credible, as the record indicated possibly symptom magnification. (R. at 245.) Dr. Johnson found his conclusions consistent with the opinions of Lester's treating physician. (R. at 250.) Dr. Johnson's findings were affirmed on June 11, 2003, by Dr. Randall Hays, M.D., another state agency

-16-

physician. (R. at 250.)

Eugenie Hamilton, Ph.D., a state agency psychologist, completed a Mental Residual Functional Capacity Assessment for Lester on April 21, 2003. (R. at 251-56.) Hamilton found that Lester was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel to unfamiliar places or use public transportation or to set realistic goals or make plans independently of others. (R. at 251-52.) Hamilton found that Lester was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods and to respond appropriately to changes in the work setting. (R. at 251-52.) Hamilton found that despite some limitations in concentration and persistence, Lester had the ability to engage in simple unskilled

-17-

competitive work.  (R. at 253.)

Hamilton also completed a Psychiatric Review Technique form, ("PRTF"), for Lester on April 21, 2003.  (R. at 257-71.)  In the PRTF, Hamilton concluded that Lester had an affective disorder, an anxiety-related disorder and a somatoform disorder.  (R. at 257.)  Hamilton determined that Lester's affective disorder, depression, did not precisely satisfy the diagnostic criteria for disability benefits, nor did his anxiety-related disorder, anxiety, or his somatoform disorder, a pain disorder associated with both psychological factors and a general medical condition satisfy the diagnostic criteria for disability benefits.  (R. at 260, 262-63.)  Hamilton found that Lester was mildly limited in activities of daily living, moderately limited in maintaining concentration, persistence or pace and not limited in maintaining social functioning  (R. at 267.)  Hamilton found that Lester was not limited by repeated episodes of decompensation.  (R. at 267.)  Although Hamilton acknowledged that Lester claimed he took special education classes in school, Hamilton noted that there was no allegation of learning problems nor other evidence of borderline intellectual functioning or low intellectual functioning. (R. at 270.) Hamilton stated that Lester's self-reported limited reading ability indicated a likelihood of specific reading disability. (R. at 270.)  Hamilton found Lester's allegations only partially credible and indicated that Lester was capable of performing simple unskilled competitive work.  (R. at 270.)  Hamilton's findings were affirmed on June 11, 2003, by Hugh Tenison, Ph.D, another state agency psychologist.  (R. at 257.)

Lester saw Salamone for a follow-up psychotherapy session on June 11, 2003. (R. at 311-12.)  Salamone observed that Lester seemed subdued, evinced poor eye

-18-

contact and was only marginally engaged during the session. (R. at 311.) While Dr. Salamone encouraged Lester to improve his activity level, Lester remained pessimistic about his situation. (R. at 311.) Salamone surmised that he was not making much headway with regard to getting Lester to better conceptualize his situation as one in which he needed to take a more active role. (R. at 311.) Lester also saw Dr. Marshall on June 11, 2003. (R. at 309-10.) Lester's wife indicated that Lester had ceased taking Paxil because he could not afford it, although she believed that it had made Lester less irritable and more capable of tolerating his pain. (R. at 309.) Dr. Marshall found Lester unchanged and with a flat affect and prescribed Paxil. (R. at 309.)

Lester visited Salamone on July 10, 2003, for a psychotherapy session. (R. at 307-08.) Again, Salamone noted that Lester presented remarkably subdued and rather inert. (R. at 307.) Lester reported that he did nothing during the day but sit around. (R. at 307.) Salamone encouraged Lester to increase his activity level, but found Lester unreceptive to the idea. (R. at 307.)

On July 19, 2003, Lester visited Stone Mountain Health Services, ("Stone Mountain"), for a behavioral health follow-up. (R. at 284.) Lester reported that he remained depressed and often isolated himself. (R. at 284.) Crystal Burke, a licensed clinical social worker, found that Lester continued to have significant symptoms of a major depressive disorder and encouraged him to take his medications as prescribed and to find local resources to help deal with his problems. (R. at 284.)

On July 22, 2003, Arthur C. Ballas, Ph.D., performed a psychological

-19-

evaluation on Lester. (R. at 272-79.) Ballas administered to Lester the Wide Range Achievement Test-3, ("WRAT-3"), the Wechsler Adult Intelligence Scale-III IQ test, ("WAIS-III"), the Wechsler Memory Scale-Form 1, ("WMS-I"), a Pain Patient Profile, ("P3"), and a Personality Assessment Inventory, ("PAI"). (R. at 272.) Ballas indicated that from the outset and throughout the evaluation, Lester's affect was depressed, his movements were lethargic and he avoided eye contact with the examiner. (R. at 273.) Ballas further noted that Lester was "manifestly uncomfortable, frequently shifting positions in his chair." (R. at 273.) Ballas also found that Lester addressed the various tests presented to him in a somewhat grudging manner; however, his efforts were considered sufficiently adequate in providing representative indices of his present levels of functioning. (R. at 273-74.) On the WRAT-3, Lester earned a reading score of 30, a third-grade level and in the 0.9 percentile, and an arithmetic score of 32, a fifth-grade level and in the fourth percentile. (R. at 274.) Ballas stated that these scores indicated that Lester was functionally illiterate. (R. at 274.) The WAIS-III revealed that Lester had a full-scale IQ score of 74, a verbal IQ score of 73 and a performance IQ score of 78, which classified him as borderline intelligent. (R. at 274-75.)

On the WMS-I, Lester produced an memory quotient of 61, which classified him as mentally retarded and displayed psychomotor retardation and difficulties sustaining concentration. (R. at 276.) Lester's P-3 and PAI inventories described him as a severely depressed and anxious individual, inferred to be secondary to physical malfunctioning/health concerns. (R. at 276.) Lester was further depicted as experiencing high levels of stress and an inability to cope with his present difficulties. (R. at 276.) Ballas indicated that although Lester did not appear to be suicidal, he did

-20-

entertain such thoughts, and without therapeutic attention, there was a strong possibility that Lester's emotional condition would deteriorate and that he could decompensate. (R. at 276.) Burke agreed with this evaluation in its entirety and added that Lester's chronic and pervasive symptoms of depression inhibited his basic activities of daily living and precluded any ability to participate in gainful employment. (R. at 303.)

Ballas also completed an Assessment To Do Work-Related Activity for Lester on July 22, 2003. (R. at 279-80.) Ballas indicated that in making occupational adjustments, Lester had a fair ability to follow work rules, to use judgment and to function independently, a poor ability to relate to co-workers, to interact with supervisors and to maintain attention and concentration and no ability to deal with the public or to deal with work stresses. (R. at 279.) Ballas stated that Lester suffered from significant psychological distress, impaired coping ability and clinically severe depression. (R. at 279.) In evaluating Lester's ability to make performance adjustments, Ballas determined that Lester had a fair ability to understand, remember and carry out simple job instructions, a poor ability to understand, remember and carry out detailed instructions and no ability to understand, remember and carry out complex job instructions due to his borderline IQ scores and impaired concentration. (R. at 279.) Ballas also determined that in making personal and social adjustments, Lester had a fair ability to maintain his personal appearance, while he had a poor ability to behave in an emotionally stable manner, to relate predictably in social situations or to demonstrate reliability. (R. at 279.)

On July 24, 2003, Burke found Lester severely depressed and suggested he

-21-

obtain antidepressants from his primary care physician. (R. at 283.) On October 17, 2003, Lester reported to Burke that he had been unable to have Paxil filled and had been unsuccessful in obtaining any other antidepressant medications. (R. at 282.) Lester indicated that he felt hopeless and helpless and suffered from crying episodes and sleep disturbance, but denied any suicidal or homicidal ideation. (R. at 282.) On November 14, 2003, Lester saw Burke for behavioral health treatment. (R. at 281.) Lester indicated that compensation benefits had been approved to pay for his prescription for an antidepressant. (R. at 281.) Burke noted that it could be several weeks before significant improvement from antidepressant therapy could be seen, but that Lester should continue to socialize with his family as a coping strategy. (R. at 287.)

Lester visited Dr. Marshall on November 26, 2003, for a recheck. (R. at 305-06.) Lester reported that his condition had not improved, and he continued to do nothing during the day. (R. at 305.) Dr. Marshall indicated that he believed Lester's presentation during appointments could be different than what was presented outside the health care community. (R. at 305.) In fact, Dr. Marshall stated,

> I am not really quite sure what is going on with Mr. Lester. I have always had concerns about his official diagnoses and his behavioral presentation....Given the fact that [Lester] reports the Soma and Lortab are not helping him function, i.e., not helping him return to work or normal home, self-care, ADL activities, despite his relatively normal work-up and second opinion by Dr. Brasfield, along with Dr. Lorio's diagnoses, I am hesitant to continue it...I think from the standpoint of his increased symptoms reported and the fact that he has not seen Dr. Lorio since 02/21/03, we need to rule-out any progressive disease process, so I will ask Dr. Lorio to recheck him. I really cannot imagine it progressing if he is and, given his original diagnosis, it should remain

-22-

chronic and stable, if not resolved and improved        ....

(R. at 305.)

On January 22, 2004, Burke found that Lester had only a poor ability to do all work-related activities. (R. at 280.) On March 3, 2004, Lester saw Mehlferber for a follow-up. (R. at 297.) Mehlferber found Lester to have some spinous process tenderness at approximately the L4-5 level and diagnosed Lester with low back pain with radiculopathy, degenerative disc changes minimal at the L4-5 and L5-S1 levels and minimal disc bulge at the L4-5 and L5-S1 levels. (R. at 297.) Lester informed Mehlferber that he would like a third opinion on whether he was a surgical candidate. (R. at 297.)

Dr. Dennis M. Aguirre, M.D., performed a comprehensive evaluation on Lester on May 17, 2004. (R. at 336-39.) Lester complained of a constant dull ache, localized in his mid-back that increased to a sharp burning-like sensation that radiated diffusely up his entire spine. (R. at 336.) Lester indicated that standing, walking, bending, lifting and twisting exacerbated his pain. (R. at 336.) Upon an examination, Dr. Aguirre noted that Lester appeared quite depressed, but did not appear to be in any acute distress or discomfort. (R. at 337.) Dr. Aguirre found that Lester had a limited range or motion of his lumbar spine, could barely flex 30 degrees and could not extend beyond 10 degrees without severe back pain. (R. at 337.) Dr. Aguirre further found that Lester's mechanical signs were negative to greater than 90 degrees, and his hip rotational testing was negative. (R. at 337.) Lester's motor strength in the lower extremities demonstrated some giveaway weakness, but with testing and distraction, strength was felt to be 5/5 at all levels. (R. at 337.) With palpation of the lower lumbar spine, Lester had diffuse lumbosacral myofascial spasm and midline

-23-

spasm. (R. at 337.) Dr. Aguirre diagnosed Lester with chronic lumbosacral myofascial strain and underlying psychological issues. (R. at 338.) Dr. Aguirre prescribed Lester Baclofen and Norpramin and increased his dose of Neurontin. (R. at 338.) Dr. Aguirre recommended that Lester visit a chiropractor and that he receive an epidural steroid block. (R. at 338.) On July 29, 2004, Lester reported that Neurontin, Norpramin and Baclofen had all caused adverse effects, and he had not visited a chiropractor as recommended. (R. at 343.) Dr. John W. Whiteley, M.D., recommended a trial of Celebrex and Skelaxin. (R. at 343.)

On August 27, 2004, B. Wayne Lanthorn, Ph.D., performed a psychological exam on Lester. (R. at 362-72.) Lanthorn also administered to Lester the WAIS-III, the P3 and the PAI, whose results were within a five point margin of the results Ballas obtained. (R. at 362-63.) The WAIS-III revealed that Lester had a full-scale IQ score of 69, a verbal IQ score of 72 and a performance IQ score of 72, placing him in the extremely low range of current intellectual functioning. (R. at 363, 367.) The results of the P3 showed that Lester scored in the uppermost range of severity on all three scales, and Lanthorn found these results to be valid. (R. at 368.) The PAI produced a valid profile that revealed that Lester had severe clinical depression, a high degree of ongoing generalized anxiety and tension and severe secondary insomnia. (R. at 372.) Lanthorn also determined that Lester had a Global Assessment of Functioning, ("GAF"), of 40-45.[7] (R. at 372.) Lanthorn found that, cognitively, Lester had

---

[7]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31 to 40 indicates "[s]ome impairment in reality testing or communication ... OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. ..." DSM-IV at 32. A GAF of 41-50

significant problems with concentration and enervation, difficulties completing tasks, difficulties focusing his attention and problems in making decisions. (R. at 372.) Lanthorn determined that the test results, overall, indicated that Lester's self-esteem had plummeted since his injury and that he felt "unmanly" as a result of being unable to provide for his family. (R. at 372.) Lanthorn diagnosed Lester with a major depressive disorder, a generalized anxiety disorder, a pain disorder associated with both psychological factors and a chronic medical condition and mild mental retardation. (R. at 371-72.) Based upon the results of the psychological evaluation, Lanthorn found that Lester had severe limitations in his overall adaptability skills and strongly encouraged Lester to continue receiving ongoing psychotherapy and to undergo a psychiatric evaluation to see if Lester required psychotropic medications for depression, anxiety and insomnia. (R. at 372.)

Lanthorn also completed an Assessment To Do Work-Related Activity for Lester. (R. at 373.) Lester indicated that in making occupational adjustments, Lester had a poor ability to follow work rules, to function independently and to maintain attention and concentration, while he had no ability to use judgment, to relate to co-workers, to interact with supervisors, to deal with the public or to deal with work stresses. (R. at 373.) In evaluating Lester's ability to make performance adjustments, Lanthorn determined that Lester had a fair ability to understand, remember and carry out simple job instructions and a poor ability to understand, remember and carry out detailed instructions and to understand, remember and carry out complex job instructions. (R. at 373.) Lanthorn also determined that in making personal and

_____

indicates "[s]erious symptoms...OR any serious impairment in social, occupational, or school functioning..." DSM-IV at 32.

social adjustments, Lester had a fair ability to maintain his personal appearance, while he had a poor ability to behave in an emotionally stable manner, to relate predictably in social situations or to demonstrate reliability. (R. at 373.)

## III. Analysis

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2006); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520 (2006). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a) (2006).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy the burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2) (West 2003 and Supp. 2005); 42 U.S.C.A. § 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2005); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617

-26-

F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 16, 2005, the ALJ denied Lester's claims. (R. at 15-32.) The ALJ found that Lester was insured for DIB purposes through February 16, 2005. (R. at 31.) Furthermore, the ALJ found that Lester had not engaged in substantial gainful activity since August 5, 2002. (R. at 31.) The ALJ found that Lester suffered from a back disorder and depression/anxiety disorder, which are severe impairments, but that Lester did not have an impairment or combination of impairments listed at or medically equal to one listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 31.) The ALJ also found that Lester's allegations regarding his limitations were not totally credible. (R. at 31.) The ALJ found that Lester had the residual functional capacity to perform a significant range of light work, but that Lester was unable to perform his past relevant work. (R. at 31.) Based on Lester's age, education, past work and residual functional capacity and the testimony of a vocational expert, the ALJ found that there were a significant number of jobs in the national economy that Lester could perform, such as watch guard, parking lot attendant, hand packer, laundry worker and vehicle/equipment cleaner. (R. at 31.) Thus, the ALJ found that Lester was not under a disability as defined by the Act at any time through the date of the decision and was not eligible for benefits. (R. at 31.) *See* 20 C.F.R. § 404.1520(g) (2006).

Lester argues the ALJ's decision was not based on substantial evidence of record. (Brief In Support Of Plaintiff's Motion For Summary Judgment, ("Plaintiff's Brief")). First, Lester argues that substantial evidence does not support the ALJ's finding that his anxiety/depressive disorder and mental retardation were not severe

Case 1:05-cv-00088-GMW-PMS   Document 15   Filed 07/13/06   Page 27 of 36   Pageid#: 116

enough to meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Plaintiff's Brief at 19). Second, Lester argues that substantial evidence does not support the ALJ's determination as to his residual functional capacity. (Plaintiff's Brief at 19).

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained her findings and her rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. § 404.1527(d), if she sufficiently explains his rationale and if the record supports his findings.

Lester argues that the ALJ erred in finding that he did not meet the listing for

-28-

his anxiety-related disorder and depressive disorder. (Plaintiff's Brief at 19.) In order for a claimant to be disabled by reason of an anxiety-related disorder, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.06 requires the claimant satisfy the requirements in subpart A and B or subpart A and C. Subpart A provides the signs and symptoms required to establish the medical impairment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06 (2006). Subpart B is met when a claimant proves that his disability results in either a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06. Subpart C is satisfied when the claimant has a complete inability to function independently outside the area of his home. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.06.

The requirements in 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.04 for qualifying for disability based on an affective disorder are met when a claimant meets the conditions in either subpart A and B or subpart C. Similar to the subparts in Listing § 12.06, subpart A in Listing § 12.04 provides the signs and symptoms necessary to establish the medical impairment, while subpart B provides the requisite level of severity of the impairment: a marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §§ 12.04, 12.06. Subpart C pertains to chronic affective disorders of at least two years that have caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support. 20 C.F.R. Pt. 404, Subpt.

P, App. 1, § 12.04.

I find that substantial evidence exists to support the ALJ's finding that Lester did not have an impairment that met or medically equaled the requirements, respectively, in Listing §§ 12.04 and 12.06. While the ALJ found both Lester's anxiety-related disorder and depression to be severe, there is no evidence that either of these impairments resulted in marked limitations in functioning. In making his decision, the ALJ relied on evidence that Lester was able to concentrate well enough to make decisions, as he was able to operate a motor vehicle, have primary care of his small child for periods of time, run errands such as shopping and doctor's visits, read books to his young child, take his young child for walks and watch television. (R. at 22, 398-99, 400-03, 405.) The ALJ also noted that Lester was able to cooperate throughout his interviews. (R. at 22.) Furthermore, the ALJ also found that Lester could take care of his personal needs, help his wife around the house and visit friends and relatives. (R. at 23, 401, 403.) The ALJ also could find no evidence of record that would support a finding that Lester suffered from the "C" criteria in either Listing §§ 12.04 and 12.06. Accordingly, I find substantial evidence supports the ALJ's finding that Lester did not suffer from a severe impairment that met or medically equaled the requirements in §§ 12.04 and 12.06.

Lester further argues that substantial evidence does not support the ALJ's finding that he did meet the listings for mental retardation. (Plaintiff's Brief at 19). To qualify as disabled because of mental retardation under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C), a claimant must be "significantly subaverage [in] general intellectual functioning with deficits in adaptive functioning initially

-30-

manifested during the developmental period: i.e., the evidence demonstrates or supports onset of the impairments before age 22." In addition, a claimant's condition must meet two requirements: (1) a valid verbal, performance or full-scale IQ score of 60 through 70 and (2) a physical or other mental impairment imposing additional and significant work-related limitation of function.

Based on my review of the record, I find that substantial evidence supports the ALJ's finding that Lester's impairments did not meet or medically equal the requirements under 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(C). First, there is no substantial evidence that Lester suffered from an impairment that met the diagnostic description for mental retardation and existed before the age of 22. Arthur C. Ballas, Ph.D., in his psychological evaluation of Lester, determined that Lester had a full-scale IQ score of 74, and, thus, suffered from borderline intellectual functioning. (R. at 274-75.) However, borderline intellectual functioning does not satisfy the claimant's burden of proving mental retardation. *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). Although another IQ test showed that Lester had a full-scale IQ score of 69, neither of Lester's IQ tests were performed before Lester reached the age of 22. (R. at 272-79, 362-72.) In fact, the record is essentially devoid of any evidence that Lester suffered from mental retardation before the age of 22. Lester's high school test scores and grades do not suggest that he was a mentally retarded child. (R. at 22.) Furthermore, Lester was not placed in special education classes and played high school sports, and ultimately, graduated high school 31 out of 67 students. (R. at 22, 457, 470.) As an adult, Lester worked in various semi-skilled jobs and was able to maintain a relationship with his wife and children and drive an automobile. (R. at 104, 120, 466.) It was not until Lester suffered a back

-31-

injury that he quit working; it was not due to mental retardation. (R. at 101, 117, 132, 223, 330, 412.)

Second, substantial evidence does not exist to support a finding that Lester had a valid verbal, performance or full-scale IQ score of 60 through 70. Ballas determined that Lester had a full-scale IQ score of 74, a verbal IQ score of 73 and a performance IQ score 78, and B. Wayne Lanthorn, Ph.D., determined that Lester had a full-scale IQ score of 69, a verbal IQ score of 72 and a performance IQ score 72. (R. at 274-75, 363, 367.) These are the only IQ scores of record. While a full-scale IQ score of 69 could indicate mild mental retardation, as stated above, there is no indication that Lester functioned at this level before the age of 22. Moreover, this score conflicts with the full-scale IQ score that Ballas assigned to Lester. Therefore, this court finds that substantial evidence supports the ALJ's finding that Lester did not meet the listing for mental retardation.

Lester also argues that substantial evidence does not support the ALJ's determination as to his residual functional capacity. (Plaintiff's Brief at 19). According to the regulations, work is light if it "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing." 20 C.F.R. § 404.1567(b), (2006). The regulations further state that "an individual must have the ability to do substantially all of these activities" in order to be capable of "light work." 20 C.F.R. § 404.1567(b). In determining Lester's residual functional capacity, the ALJ found that Lester's assertions of debilitating pain were not consistent with the medical

-32-

evidence of record. (R. at 25.) The ALJ noted Lester's MRI results, which showed minimal problems with bulging, and Lester's physicians' conservative approach to treatment. (R. at 25, 164, 166, 209.) Lester even testified that his doctor simply recommended taking over-the-counter pain medications, since Lester continually reported that prescription pain medications did not ease his pain. (R. at 305, 444-45.) On numerous occasions Lester was advised that he could return to light duty, both by his physical therapist and by his treating physician, Dr. Lorio. (R. at 25, 173, 175, 209, 299, 346.) Dr. Brasfield also opined that Lester was not a surgical candidate. (R. at 314.) The ALJ also found relevant that Lester failed to follow advice from his physicians, such as seeing a chiropractor, continuing physical therapy and receiving epidural injections. (R. at 25, 338, 343, 408.) The ALJ further found that Lester's daily activities were inconsistent with debilitating pain, and consequently, adopted the state agency physician's residual physical functional capacity assessment that found that Lester could lift and/or carry 10 pounds frequently and 25 pounds occasionally; stand and/or walk about six hours in an eight-hour workday; and sit about six hours in an eight-hour workday with limited use of the lower extremities. (R. at 27, 243-50.) This assessment did, however, find that Lester should avoid climbing ladders, ropes and scaffolds and should avoid more than occasional stooping, kneeling, crouching and crawling, which are limitations that the ALJ accounted for in determining Lester's residual functional capacity. (R. at 27-28, 243-50.)

The ALJ also considered Lester's psychological impairments in determining Lester's residual functional capacity. (R. at 25-28.) The ALJ noted Lester's lack of compliance with treatment for his depression, such as his refusal to increase his

-33-

activity level and his intermittent treatment for his condition. (R. at 25-26, 236, 238, 307, 311.) The ALJ properly rejected the opinions of Arthur C. Ballas, Ph.D., B. Wayne Lanthorn, Ph.D., and Crystal Burke, LCSW, all of which found that Lester had only a poor ability to function in most work-related areas. (R. at 26, 262-73, 279-80, 303, .) The ALJ discredited Ballas's and Lanthorn's opinions, in part, because neither psychologist was a treating professional, but was simply retained by Lester's counsel prior to hearing. (R. at 26.) The ALJ found these opinions inconsistent with Lester's daily activities, the medical evidence of record and the opinions of other examining and treating physicians. (R. at 27.) The ALJ noted that Burke made her determination of Lester's capabilities at a time when she had met with Lester on only a few sporadic occasions. (R. at 27, 303.)

The ALJ accepted the assessment of Eugenie Hamilton, Ph.D., a state agency psychologist, who completed a Mental Residual Functional Capacity Assessment and a PRTF for Lester April 21, 2003. (R. at 27, 251-56.) Hamilton found that Lester was not significantly limited in his ability to remember locations and work-like procedures, to understand and remember very short and simple instructions, to carry out very short and simple instructions, to perform activities within a schedule, to maintain regular attendance and be punctual within customary tolerances, to sustain an ordinary routine without special supervision, to work in coordination with or in proximity to others without being distracted by them, to make simple work-related decisions, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions

-34-

and respond appropriately to criticism from supervisors, to get along with co-workers or peers without distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and take appropriate precautions, to travel to unfamiliar places or use public transportation or to set realistic goals or make plans independently of others. (R. at 251-52.) Hamilton found that Lester was moderately limited in his ability to understand and remember detailed instructions, to carry out detailed instructions, to maintain attention and concentration for extended periods and to respond appropriately to changes in the work setting. (R. at 251-52.) Hamilton found that despite some limitations in concentration and persistence, Lester had the ability to engage in simple unskilled competitive work. (R. at 253.) In the PRTF, Hamilton found that Lester was mildly limited in activities of daily living, moderately limited in maintaining concentration, persistence or pace and not limited in maintaining social functioning. (R. at 267.) Hamilton found that Lester was not limited by repeated episodes of decompensation. (R. at 267.) Although Hamilton acknowledged that Lester claimed he took special education classes in school, Hamilton noted that there was no allegation of learning problems nor other evidence of borderline intellectual functioning or low intellectual functioning. (R. at 270.) Hamilton found Lester's allegations only partially credible and indicated that Lester was capable of performing simple unskilled competitive work. (R. at 270.) The ALJ used Hamilton's assessment in determining Lester's residual functional capacity, but also assigned slightly more limiting parameters, such as mild limitations on daily living *and* social functioning. (R. at 27.) As such, I find that substantial evidence supports the ALJ's determination of Lester's residual functional capacity.

*IV. Conclusion*

For the foregoing reasons, I will overrule Lester's motion for summary judgment, sustain the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

DATED:     This 13th day of July 2006.

SENIOR UNITED STATES DISTRICT JUDGE